UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARSHA HORSLEY,** | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CV 01-BU-0603-S |
| **UNITED PARCEL SERVICE,** | ) ) | |
| Defendant. | ) ) | |

# Memorandum Opinion

In the above-styled action, Plaintiff Marsha Horsley brings claims against her employer, Defendant United Parcel Service ("UPS"), based on allegations that she was subjected to sexual harassment, and retaliation for complaining about sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Now before the Court is UPS's motion for summary judgment, (Doc. No. 13), filed September 17, 2001. Based on the evidence and the arguments presented by the parties, the Court concludes that Plaintiff's motion for summary judgment is due to be GRANTED.

I. BACKGROUND[1]

Defendant UPS hired Plaintiff in 1983 to work as a part-time clerk on the "next day air sort" in their "Citation Court" location in Birmingham, Alabama (apparently also known as the Oxmoor facility). In November, 1984 Plaintiff was transferred to UPS's new facility in Roebuck, Alabama where she was promoted in 1990 to part-time supervisor over the next day air sort operation. In this position, Plaintiff had several employees who reported directly to her. Plaintiff reported to a full-time local sort supervisor. From approximately 1998 until November 1999, plaintiff's immediate supervisor was Randy Spence ("Spence"). In November, 1999, Plaintiff applied for and was promoted to a full-time position, Feeder Dispatcher, back at the Citation Court location. Plaintiff is currently employed in this position.

UPS has longstanding, well-publicized written policies prohibiting sexual harassment and discrimination in the workplace. The policies provide for alternative channels for resolving complaints,[2] and are posted conspicuously on employee bulletin

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] The UPS written policy provides: "Employees who believe they are being harassed should request that the conduct cease. They should take any complaint to their supervisor [sic] and/or human resource manager. . . .If you believe you have been the subject of sexual harassment, or if you are aware of a situation that could constitute sexual harassment, immediately notify your supervisor or the Human Resources Manager (who is the designated Affirmative Action Officer in your district). The matter will be investigated in a confidential manner." Plaintiff's Exhibits A & B.

boards in UPS facilities. Any employee can go to her immediate supervisor, another management person, Human Resources, or utilize a toll-free confidential telephone hotline to report any potential misconduct. UPS also conducts annual or semi-annual training on these policies for all its employees. As a part-time supervisor in Roebuck, Plaintiff led harassment training for employees at least twice, and has herself received training from her supervisors regarding UPS sexual harassment policy. Pursuant to UPS's policy, Plaintiff, as well as all other supervisors, has a duty to report any incidents of sexual harassment.[3]

Plaintiff alleges that, beginning in 1996 or 1997, an hourly employee UPS employee, James Gipson ("Gipson"), began sexually harassing her. Gipson was a Feeder Driver based out of Citation Court; at the time, Plaintiff was a part-time supervisor at Roebuck. From 1996 or 1997 until the Fall of 1999, Gipson made nightly delivery stops at Roebuck. He would arrive at Roebuck between 11:00 and 11:30 p.m., drop off his trailer, and pick up another trailer. Gipson also picked up the internal UPS mail going from Roebuck to Citation Court. Gipson spent roughly one hour each night at the Roebuck facility.

In 1996 or 1997 Gipson began making comments to Plaintiff such as "I love you," "you have a nice body," and "I bet you look good in a bikini." Gipson also began

---

[3]The UPS written policy provides: "Managers and supervisors are responsible for maintaining an environment free of sexual harassment. That responsibility includes reporting incidents of sexual harassment to the appropriate management people." Plaintiff's Exhibits A & B.

touching Plaintiff in various ways; Gipson touched Plaintiff's forearm, put his arm around her, rubbing her shoulders, and on one occasion touched Plaintiff's calf. Plaintiff asserts that she was offended by the physical contact and the comments, but stated that she did not report the behavior to anyone because she feared that Gipson would be terminated.

The internal mail bag picked up from Roebuck was assembled by Plaintiff and Tammy Bailey ("Bailey"), a female employee under the supervision of Plaintiff. The two worked late hours, and were generally among the only employees present at the Roebuck facility during their shifts. Because the pair worked such late hours, the employee parking lot was usually deserted when Plaintiff and Bailey left for the night. Gipson took to escorting the two women to their cars at night, despite the protestations of the women. In the summer of 1999, Bailey asked Plaintiff to do something about Gipson's behavior, referring to Gipson's touching Bailey, making sexual comments to her and walking her to car at night. Because of Bailey's request, Plaintiff met with Spence, her supervisor, and asked that he help reign in Gipson's behavior.[4] Plaintiff mentioned that Gipson had been making "out of line comments," and had been walking Bailey and Plaintiff to their cars. Plaintiff asked Spence to talk to Gipson so that he would stop the unwanted activities.

---

[4] It is unclear whether Plaintiff met with Spence alone, or with Bailey present. In fact, Spence disputes that Plaintiff ever met with him, asserting instead that it was Bailey with whom he met. As UPS has so stipulated, the Court will assume that both Bailey and Plaintiff met with Spence together.

Spence did in fact speak to Gipson about his behavior towards Plaintiff and Bailey. For about two weeks, Gipson had no contact with Plaintiff. However, at some point soon thereafter, Gipson resumed the unwanted behavior. At no time did Plaintiff alert Spence, or anyone else, that Gipson had resumed such behavior at the Roebuck facility. Plaintiff later told Toby Baginski, UPS Employee Relations Manager ("Baginski"), that Gipson did not bother her for the remainder of her time at the Roebuck plant following Spence's meeting with Gipson. See, Plaintiff's Exhibit 6; Plaintiff's Exhibit C.

In November, 1999, Plaintiff applied for a full-time position as Feeder Dispatcher at Citation Court. Plaintiff understood that this position would put her in constant contact with Gipson, a feeder driver based out of Citation Court. Plaintiff never communicated any concern about working with Gipson during her interviews for the position, or at any other time. When Plaintiff did the nightly yard check to make certain all of the trailers were dispatched properly, Gipson would shout out "I love you" to Plaintiff. When Plaintiff saw Gipson as he was clocking out, he would make comments to Plaintiff like "I love you," "you have a nice body," or "I bet you are good in bed." Usually Plaintiff either would ignore the comments, or try to avoid contact with Gipson altogether. Plaintiff did not report any of this conduct to anyone at UPS.

On June 20, 2000, Plaintiff approached her immediate supervisor, Scott Raley, to ask him if she could leave work early that day so she could eat dinner with her family.

During the conversation, Raley told Plaintiff that he wanted her to begin learning the dispatch routes by riding along with the feeder drivers. Plaintiff responded that she did not feel comfortable riding with Gipson, as he had made offensive sexual comments to her in the past. Raley told Plaintiff that he would handle the situation by stopping Gipson's unwanted conduct. The following morning Raley went to a management conference at Auburn which lasted until June 22, 2000.

On the afternoon of June 21, 2000, Plaintiff went to her car to get some headache medicine. While Plaintiff was leaning in her car, Gipson came up behind her, touched her on the back, lowered his head next to hers, and asked, "have I told you lately that I love you?" Plaintiff pushed him away. Gipson then asked Plaintiff "have you ever been raped?" Gipson then touched Plaintiff's buttocks, allegedly to wipe away some debris. Plaintiff slapped away Gipson's hand. The two then began a conversation regarding Plaintiff's deteriorating relationship with her husband.

On the evening of June 22, 2000, Raley returned from the conference in Auburn to Citation Court. When Raley went to check in on Plaintiff, she relayed to him the latest incident of the previous day. Gipson was immediately taken out of service, pending an investigation. Plaintiff also complained to Pete Price, Raley's supervisor, and to Baginski. As a result of the investigation Gipson was terminated.

After Gipson was terminated, Plaintiff began to feel ostracized by some of her fellow employees. Specifically, certain of the drivers would leave the computers for their

trucks outside of Plaintiff's office, as opposed to handing them to her. Plaintiff was also told by one of the clerks under her charge that another female employee had called Plaintiff a "whore." Plaintiff felt that, in general, many of the employees became short with her.

During the investigation surrounding Gipson's termination, Plaintiff had mentioned to Baginski that she feared that other employees would be angry with her. Baginski gave Plaintiff his home and cellular phone numbers and asked that she call him if she had any such problems. Baginski checked in on Plaintiff from time to time; Plaintiff told Baginski that she thought everything was fine but that the other employees looked at her strangely. Plaintiff also complained to Price and Raley about the behavior of some of the drivers towards her, specifically mentioning to Price the computers being left outside her door. It appears that Price stopped that practice. Raley spoke to the feeder drivers about their conduct. Plaintiff reported that the situation had improved somewhat as of the time of her deposition.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for the motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996); see also Resolution Trust Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied sub. nom., 516 U.S. 817 (1995).

Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

III. DISCUSSION

A. Hostile Work Environment Claim

Plaintiff alleges that she was subjected to a continuous pattern of sexual harassment by one of her co-workers, James Gipson, that commenced around 1996 or 1997. Plaintiff argues that UPS did not take prompt remedial action reasonably calculated to prevent Gipson from harassing Plaintiff further. UPS concedes that Gipson subjected Plaintiff to hostile work environment sexual harassment, but contests its own liability on the basis that it took prompt action that was both calculated to abate, and did actually abate, the harassment.

To establish a prima facie case of hostile work environment sexual harassment, the plaintiff must demonstrate a basis for holding the employer liable for the harassment. See, Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), cert. denied, 529 U.S. 1068 (2000).[5] Employer liability in a case involving sexual harassment by a co-worker exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action. See Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000) (citing Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982)).

---

[5]The other elements of a prima facie case of hostile work environment sexual harassment require a plaintiff to establish: (1) she is a member of a protected group; (2) she was the subject of unwelcome sexual harassment; (3) the harassment occurred because of her sex; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. See Mendoza, 195 F.3d at 1245. For the purposes of this motion, UPS concedes that the Plaintiff can prove these elements. Therefore, the Court will assume them established.

UPS's sexual harassment policy provides that, (1) a victimized employee should go to his or her supervisor or the Human Resource Manager, and (2) a supervisor must report instances of sexual harassment to her proper superior. See supra, notes 2 & 3. In the instant case, Bailey alerted Plaintiff that she was bothered by Gipson's behavior. Plaintiff in turn alerted Spence that Gipson had been behaving inappropriately and asked that he make Gipson cease the unwanted conduct. When an employer has a clear and published sexual harassment reporting policy, "the sole inquiry . . . is whether the complaining employee followed [its] procedures . . . ." Breda, 222 F.3d at 890. The Court finds that UPS's policy was both "clear" and "published," and that Plaintiff properly followed its strictures. Therefore, the Court finds that UPS had actual notice of Gipson's harassing conduct.

The next question the Court must address is the reasonableness of Spence's response to Plaintiff's complaint. The substance of Plaintiff's complaint to Spence is not entirely clear. It appears that Plaintiff mentioned that she and Tammy Bailey objected to Gipson walking them to their cars at night, stating that it "just didn't look right." Plaintiff also testified that she told Spence that Gipson was "out of line," frequently making comments about Plaintiff's body or general appearance. Spence then spoke with Gipson and asked that he not walk either Plaintiff or Bailey to her car. It is undisputed that Gipson never again attempted to walk Plaintiff to her car; it was months before he ever attempted to walk Bailey to her car. Spence also admonished Gipson not to touch or

make comments to Bailey or Plaintiff. That Spence so chastised Gipson is buttressed by Gipson's reaction to the meeting with Spence. Plaintiff testified that Gipson confronted her in the employee parking lot two weeks after she complained to Spence, asking Plaintiff why she did not speak to Gipson directly. Gipson also attempted to explain to Plaintiff that he did not mean to offend her by touching her: "Well, he asked me something about I don't really touch y'all, do I, and I said, yes, Jimmy, you do. And well, like how. I said well, you'll put your arm around us going to the car. I said you've always got to touch in some way or you'll rub our arm."

Spence responded to Plaintiff's complaint immediately. In her deposition, Plaintiff stated that Gipson stayed out of contact with her for two weeks after the complaint was lodged with Spence. During the June, 2000 investigation of Gipson that ultimately led to Gipson's discharge, Plaintiff stated that Gipson did not bother her again until she transferred back to the Birmingham facility in November, 1999. That would have meant that Gipson did not harass Plaintiff for at least three months after Spence counseled Gipson about his inappropriate behavior. However, even if Gipson resumed the inappropriate behavior two weeks after having been counseled, Spence's response was eminently reasonable in light of the complaint received from Plaintiff. "Title VII does not require that an employer use the most serious sanction available to punish an offender . . . ." Dudley v. Metro-Dade County, 989 F. Supp. 1192, 1202 (S.D. Fla. 1997) (quoting Landgraf v. USI Film Products, 968 F.2d 427, 430 (5th Cir. 1992)). Nothing

that Plaintiff complained of to Spence warranted more than a verbal reprimand.

Spence raised the issue with Plaintiff again in order to let Plaintiff know that he had spoken with Gipson. Although the harassment allegedly continued, Plaintiff gave Spence no reason to know that his remedial efforts had failed. The Court finds that UPS's remedial action with respect to Plaintiff's complaint in the summer of 1999 was sufficient. Plaintiff has failed to provide any evidence to dispute that UPS's remedial actions were prompt and effective.

Plaintiff did not alert anyone at UPS to the fact that Gipson had begun harassing her again until June, 2000. Between seven and ten months elapsed before Plaintiff again put UPS on notice as to Gipson's unwanted conduct. It was not unreasonable for Spence to conclude, based on Plaintiff's silence, that his talk with Gipson had resolved the matter. Cf. Coates, 164 F.3d at 1363 (holding that where Plaintiff represented to her employer that everything was going well, the employer had no reason to have believed otherwise). After Plaintiff's June, 2000 complaint regarding Gipson, UPS immediately suspended Gipson and investigated the matter. Soon thereafter, Gipson was terminated. Therefore, it is impossible to say that UPS's actions with respect to Plaintiff's June, 2000 complaint was anything but prompt and effective. See id. at 1366. For these reasons, Plaintiff's claim for hostile work environment cannot survive UPS's motion for summary judgment.

B. Retaliation

Plaintiff alleges that she has been retaliated against by UPS because, (1) certain Feeder Drivers leave their computers outside of Plaintiff's office, as opposed to handing them to her; (2) a female subordinate was overheard by another female subordinate calling Plaintiff a "whore"; and (3) her subordinates are short with her, many of them refusing to say hello.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected activity, (2) an adverse employment action has occurred, and the adverse employment action was related to plaintiff's protected activities. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260-61 (11th Cir. 2001). In the instant case, Plaintiff's retaliation claim cannot survive UPS's motion for summary judgement because she has not provided any evidence of an adverse employment action.

Plaintiff certainly engaged in statutorily protected activity by complaining about Gipson's conduct towards her and towards Bailey. However, Plaintiff cannot satisfy the second prong of her prima facie case. An adverse employment action "as a matter of law includes not only discharges, but also demotions, refusals to promote, and reprimands." Dudley, 989 F. Supp. at 1204 (quoting McCabe v. Sharrett, Jr., 12 F.3d 1558, 1563 (11th Cir. 1994)). Although actionable discrimination extends to adverse employment decisions, "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998). The hostility directed at Plaintiff by her co-workers might create

an unpleasant work atmosphere; however, none of the instances cited by Plaintiff, taken singly or together, rises to the level of an adverse employment action as contemplated by Title VII. Cf. McCabe, 12 F.3d at 1563 (citing Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 (1990)). The Court finds that the Plaintiff has not presented any genuine issue of material fact with respect to her retaliation claim. Therefore, summary judgment is due to be granted on this score.

C. State Law Claims

The Plaintiff's remaining claims are based on state law; i.e., claims of battery, invasion of privacy, and negligent, wanton or reckless supervision or retention. Because the Court is granting UPS's motion for summary judgment on all of the Plaintiff's claims over which the Court has original jurisdiction, there is no longer an issue in this case over which the Court may exercise federal subject matter jurisdiction.

Under these circumstances, the Court may exercise its discretion, pursuant to 28 U.S.C. § 1367(c)(3) to decline the exercise of supplemental jurisdiction over the plaintiff's state law claims. See Palmer v. Hospital Auth. Of Randolph County, 22 F.3d 1559, 1568 (11th Cir. 1994) (stating that "Section 1367(c) gives a court discretion to dismiss a supplemental claim or party when 'the district court has dismissed all claims over which it has original jurisdiction.'")

The Court declines to exercise supplemental jurisdiction over the Plaintiff's remaining state law claims and orders that those claims be dismissed without prejudice,

thereby affording the plaintiff the opportunity to pursue her state law claims in state court.

## IV. CONCLUSION

The Court finds that the Plaintiff has not demonstrated the existence of any genuine issue of material fact, and that UPS is entitled to judgment as a matter of law. Based on the foregoing, the Court concludes that Defendant UPS's motion for summary judgment (Doc. No. 13) is therefore due to be GRANTED with respect to all federal claims. Plaintiff's claims brought under Title VII are therefore due to be DISMISSED WITH PREJUDICE. The Court declines to exercise supplemental jurisdiction over the remaining state law claims; consequently, such claims are DISMISSED WITHOUT PREJUDICE.

DONE and ORDERED this 31st day of October, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE